# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40583**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Vidarr SLAYTON**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 8 September 2025

————————————

*Military Judge*: Matthew A. McCall (arraignment); Brian M. Thompson.

*Sentence*: Sentence adjudged 25 August 2023 by GCM convened at Patrick Space Force Base, Florida. Sentence entered by military judge on 6 November 2023: Dishonorable discharge, confinement for 9 months, reduction to E-1, and a reprimand.

*For Appellant*: Captain Michael J. Bruzik, USAF; Dwight H. Sullivan, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Brittany M. Speirs, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and MASON, *Appellate Military Judges*.

Senior Judge GRUEN delivered the opinion of the court, in which Judge MASON joined. Chief Judge JOHNSON filed a separate opinion dissenting in part and concurring in the result in part.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

GRUEN, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault without consent upon CL, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The members sentenced Appellant to a dishonorable discharge, confinement for nine months, reduction to the grade of E-1, and a reprimand. Appellant requested that the convening authority suspend the adjudged reduction in grade and waive all automatic forfeitures for the benefit of his dependents. The convening authority denied Appellant's suspension and waiver requests, took no action on the findings, and approved the sentence in its entirety.

Appellant raises five issues on appeal, which we have reworded: (1) whether the finding of guilty to the sole charge and its specification is factually and legally insufficient because the evidence failed to establish that the alleged victim was capable of consenting during the sexual act; (2) whether the military judge erred by failing to instruct the members that an element of the alleged offense was that the alleged victim was capable of consenting at the time of the sexual act; (3) whether the Prosecution violated Appellant's constitutional right to fair notice of the criminal charge against which he would need to defend; (4) whether Article 120(b)(2) and (g)(7), UCMJ, are unconstitutionally vague because they fail to put those subject to the Code on fair notice of the specific actions those statutory provisions criminalize; and (5) whether Appellant was denied his constitutional right to a unanimous verdict.

On 7 October 2024, the United States Court of Appeals for the Armed Forces (CAAF) issued their opinion in *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024). Because the Government failed to prove the offense to which they charged—that is, proving without consent vice a sleeping victim—the Government's case was factually insufficient. Even considering the CAAF's recent decision on 20 August 2025, in *United States v. Casillas*, we hold that CL did not consent to a sexual act with Appellant at a time when she may have been capable of consenting and that the Government failed to disprove Appellant had a reasonable and honest mistake of fact beyond a reasonable doubt as to CL's consent to engage sexually with Appellant. __ M.J. __, No. 24-0089, 2025 CAAF LEXIS 692, at *4 (C.A.A.F. 20 Aug. 2025). In light of these facts and considering *Mendoza* and *Casillas*, we find Appellant's conviction for sexual assault of CL factually insufficient. For this reason, we do not address issues (2)–(5).

---

[1] Unless otherwise noted, all references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

The record of trial was docketed with this court on 15 March 2024, 203 days after the sentence was adjudged. The docketing of Appellant's case more than 150 days after sentencing creates a presumption of facially unreasonable delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020). Appellant does not contend that the facially unreasonable delay rose to the level of a due process violation. We agree no relief for post-trial delay is warranted. *See id.*; Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2).

## I. BACKGROUND

Appellant entered the military in June 2015. In March 2022, Appellant and CL, the alleged victim, were students at a training course at Keesler Air Force Base, Mississippi.[2] Appellant lodged on base while attending the course and CL stayed at an off-base hotel. When Appellant and CL first met, they got to know each other by communicating on social media and going to the gym together. About five days after meeting, they attended a concert together off base at a casino in Biloxi, Mississippi. The charge and sole specification arose from this night that Appellant and CL spent together during and after the concert.

On 12 March 2022, Appellant picked up CL at her hotel and they drove together to the casino in Biloxi. CL drank heavily while the two were there— CL recalled she drank a vodka Red Bull and a Corona beer at the bar they attended before they arrived at the concert. CL recalled Appellant also drank a vodka Red Bull, but a different kind of beer. After they left the bar they went to the concert at a theater located inside the casino. Appellant purchased a bucket of five beers for the concert. While seated next to each other at the concert, Appellant put his arm on top of CL's arm; CL did not remove it. CL recalled drinking one of the five beers from the bucket and a double shot of Jack and Coke she ordered during the concert. CL felt "very drunk" when leaving the concert. CL recalled having one more shot before they left the casino. She did not recall what kind of alcohol was in the shot or who she drank the shot with.

After CL and Appellant left the casino, they visited additional bars in the area and a Waffle House before returning to CL's hotel room. CL could not recall where the bars were located, specific conversations or specific people she interacted with, or whether she drank more alcohol at those bars. She recalled some details regarding the Waffle House, but she could not recall leaving the Waffle House or any details regarding how she got back to her hotel room. Similarly, CL did not recall details of getting ready for bed or going to bed after

---

[2] At both the time of the alleged offense and the time of trial, CL was an enlisted member of the United States Air Force.

returning to her room. The next thing CL recalled after her sparse memories of being at the Waffle House was waking up wearing only a t-shirt, lying on her side on her bed facing her window, with Appellant behind her "thrusting his penis inside of [her]." This incident formed the basis for the charge and its sole specification against Appellant of sexual assault of CL, "without her consent."

According to CL, as soon as she awoke and "felt it" she "moved over further on the bed" towards the window to stop the penetration. After the penetration stopped, CL began to cry quietly and Appellant got up from the bed, went around to CL's side of the bed and knelt in front of her and asked her what was wrong. CL responded that she "felt like he raped [her]." Upon hearing this, Appellant looked worried and expressed that he wished she did not feel like that. CL recalled Appellant said more to her, but she could not recall the specifics, and she believed she fell back to sleep in the moment—she could not recall if the conversation had ended. The next thing CL recalled was hearing her door open as Appellant left her room. After Appellant left her room, she "laid there for a while" and then called her boyfriend to tell him what happened. At some point that day she went to the emergency room because she was afraid of contracting a sexually transmitted disease or facing an unwanted pregnancy. She did not recall having any reason to believe Appellant used a condom during the sexual encounter(s). While at the emergency room, medical providers accomplished a sexual assault examination of CL. A couple of days later, CL made an unrestricted report of the incident to the Sexual Assault Response Coordinator (SARC). CL then reported the incident to Office of Special Investigations (OSI) agents.

The defense theory of the case was that Appellant held a reasonable mistake of fact that all sexual interactions between him and CL were consensual. Appellant testified that while at the casino and concert, he and CL were "opening up a lot to each other and . . . leaning into each other." He further testified that "her hand . . . grazed [his] knee and at some point [he] put [his] arm on top of hers." He also put his "arm around her and she kind of nuzzled into [his] shoulder and [he] . . . kissed the top of her." Closed circuit television (CCTV) from the casino shows them interacting in a friendly manner with him touching her shoulders and playing with her hair. CCTV further shows the two dancing together back-to-back and generally interacting in a close manner. Appellant testified that they had been "flirty all over each other all night, and then [they] were interacting on the way to the car, and then she excitedly just jumped up in [his] arms and kind of wrapped her legs around [him]." He further testified that they had hugged and kissed that night before going back to CL's hotel room.

4

Appellant further testified that while they had both been drinking, there was no indication that CL was overly intoxicated to the point of losing control of her faculties. According to him, she walked, talked, and conducted herself normally throughout the night. She did not slur her words, got in and out of the car on her own volition, and ordered her own food at the Waffle House. When they returned to her hotel, he walked her to her room, she found the door key, and opened the door without incident. Appellant testified CL recommended he stay the night in her room because it was not wise for him to drive back onto base given he had been drinking. He agreed and they went into her room together with the expectation he would stay the night. After entering her room, CL went into the bathroom and changed her clothes. When she came out of the bathroom, she lay on her bed "looking over at [Appellant] and . . . kind of giggling playfully" wearing a shirt and shorts.

According to Appellant, CL then invited him to "rub [her] back" or "to cuddle." Upon this invitation, Appellant "crawl[ed] into bed with her" and started rubbing her back. According to Appellant, they kissed and embraced on top of the covers and at some point they both moved under the covers. He claimed CL took off her own shorts and remained playful. Appellant testified that her conduct made him believe she wanted to have sex. He further stated it was CL that instigated oral sex and seemed to be engaged in and enjoying the sexual encounter. Appellant said it was CL who helped him undress and brought him a condom and instigated vaginal intercourse. He believed she was awake during all sexual encounters.

CL did not remember changing into a t-shirt and shorts, she did not remember taking off her shorts, she did not remember inviting Appellant to her bed, and she did not remember having oral sex that night.

Also according to Appellant, at some point while he and CL were in bed together he fell asleep. He recalled that when he awoke, he was flaccid, not penetrating CL, and he touched her to see how she was doing. When she recoiled at his touch, he immediately got out of bed, walked around to CL's side of the bed, kneeled down and asked her what was wrong. While Appellant was getting dressed and gathering his belongings, CL put on a robe and left her room and returned shortly thereafter with two bottles of water. She offered Appellant a bottle of water and they had a brief conversation about the previous evening. Appellant admitted that during that conversation CL expressed that she was confused about the night before and she felt like Appellant had raped her. Appellant claimed he felt "terrible and awful and sad for her and just confused," and also "hurt and scared."

Appellant did not interact with CL again until 24 March 2023 when CL texted him as part of a pretext conversation OSI agents arranged. During the text conversation, Appellant texted, *inter alia*, that he was sorry for what

happened that night and that he made mistakes. He explained while testifying that he "would say it's definitely a mistake to go out and end up having sex with another woman" while married and "it was a mistake that [he] got in the car and drove when [he] had been drinking." He did not agree that he was apologizing for having assaulted her or that his "mistakes" included having raped CL.

The Government's theory on the lack of consent was predicated solely on the fact that CL was sleeping when Appellant penetrated her. While testifying on direct, CL stated she was "one hundred percent confident" that she was asleep before she awoke to Appellant's penis in her vagina. She further confirmed that she did not consent to Appellant penetrating her vagina as she slept. In their opening statement, the Government made clear that "that is the charge in this case, that [Appellant] penetrated [CL] without her consent while she was asleep," and reiterated, "the evidence will show that she was asleep." In their closing argument the Government once again made clear that their theory of the case was that "[a] sleeping or unconscious person cannot consent," and "you can't form agreements with a sleeping or unconscious person." All of the Government's arguments centered around this theory of a sleeping victim.

## II. DISCUSSION

### A. Law

#### 1. Legal and Factual Sufficiency

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

We review questions of factual sufficiency when an appellant asserts an assignment of error and makes a specific showing of a deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.
>
> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>
> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*). This factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* The National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (2021).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.*

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, the CCA "must decide that the evidence, *as the CCA has weighed it* does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we must be clearly convinced of this decision.

### 2. *Mendoza* Issue

Appellant was convicted of sexual assault without consent, in violation of Article 120, UCMJ, which required the Government to prove the following elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon CL by penetrating her vulva with his penis; and (2) that Appellant did so without CL's consent. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d).

A charge of sexual assault without consent is a separate theory of liability from a charge of sexual assault upon a person incapable of consenting. *Mendoza*, 85 M.J. at 220. A charge of sexual assault of a person who is asleep, unconscious, or otherwise unaware the act is occurring is likewise a separate theory of liability from a charge of sexual assault without consent. *MCM*, pt. IV, ¶ 60.b.(2)(d), (e). A charge of sexual assault upon a person who was asleep alleges criminal conduct upon a person who "was asleep" when the sexual act was occurring and that "the [Appellant] knew or reasonably should have known that the other person was asleep" when "the sexual act was occurring." *MCM*, pt. IV, ¶ 60.b.(2)(e). A charge of sexual assault without consent alleges criminal conduct "upon a victim who is capable of consenting but does not consent." *Mendoza*, 85 M.J. at 220.

In "without consent" cases, evidence of a victim's level of intoxication may be relevant and admissible, *id.* at 222; however, it is improper to use this evidence "as proof of [a victim's] inability to consent and therefore proof of absence of consent" in these cases. *Id.* In other words, what "the Government cannot do is prove the absence of consent under Article 120(b)(2)(A), UCMJ, by merely establishing that the victim was too intoxicated to consent." *Id.*

Findings of guilt may be based on direct or circumstantial evidence. *Id.* at 218 (citing Rule for Courts-Martial (R.C.M.) 918(c)). "[T]he absence of direct evidence of an element of an offense does not prevent a finding of guilty for that offense from being legally sufficient." *Id.*

### 3. Defense of Reasonable Mistake of Fact as to Consent

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." R.C.M. 916(j)(1). If the mistake goes to an element requiring general intent or knowledge, it "must have existed in the mind of the accused

and must have been reasonable under all the circumstances." *Id.* Therefore, an honest and reasonable mistake that the victim consented to the charged sexual contact is an affirmative defense to the charged offense. *See*, *e.g.*, *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (considering the defense of mistake of fact to a charge of sexual assault). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 379.

In considering whether the defense of mistake of fact as to consent was raised at trial, we "consider the totality of the circumstances at the time of the offense" and consider "whether the record contains some evidence of an honest and reasonable mistake to which the [factfinder] could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citations omitted). While the quantity of evidence required is low, the record must contain evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) (citation omitted) ("[W]hile [the a]ppellant's statement may constitute a scintilla of evidence about his 'honest belief,' . . . there is not an iota of evidence that such a belief was reasonable."); *see also United States v. Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) (citation omitted) ("The testimony relied on by appellant tended to show objective circumstances upon which a reasonable person might rely to infer consent. However, they provided no insight as to whether appellant actually or subjectively did infer consent based on these circumstances.").

When determining what is reasonable, we know that "'[d]ue care' is 'such care as would be exercised by an ordinarily prudent [person] when sober.'" *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at *17 (A.F. Ct. Crim. App. 14 Oct. 2021) (unpub. op.) (quoting *United States v. Bragg*, 4 C.M.R. 778, 782 (A.F.C.M.R. 1952); then citing RESTATEMENT (SECOND) OF TORTS § 283C cmt. d (AM. LAW INST. 1965) ("[I]f a drunken person's 'conduct is not that of a reasonable man who is sober, his voluntary intoxication does not excuse' conduct that would otherwise be negligent.")), *rev'd on other grounds*, 83 M.J. 408 (C.A.A.F. 2023); *see also United States v. Moore,* No. ACM S32477, 2018 CCA LEXIS 560, at *12 (A.F. Ct. Crim App. 11 Dec. 2018) (unpub. op.) (citation omitted) ("This defense has two elements: one subjective and one objective. For the subjective element, the ignorance or mistake must have existed in Appellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult.").

The concept of "reasonably prudent person" is an objective standard. *Harrington*, unpub. op. at *17. "The actor is required to do what this ideal individual would do in his place. The reasonable man is a fictitious person, who is

never negligent, and whose conduct is always up to standard." *Id.* at \*17–18 (citing RESTATEMENT (SECOND) OF TORTS § 283 cmt. c (AM. LAW INST. 1965)); s*ee also Military Judges' Benchbook* (hereinafter *Benchbook*), Dept. of Army Pamphlet 27-9 at 1425 (29 Feb. 2020) ("A reasonable belief is one that an ordinary, prudent, sober adult would have under the circumstances."). "Voluntary intoxication does not permit what would be an unreasonable belief in the mind of a sober person to be considered reasonable because the person is intoxicated." *Benchbook*, at 1425–26.

In *United States v. Greaves*, our superior court's predecessor stated,

> It would seem that one is not being reasonable if one is being reckless or negligent. Thus it would seem that for one reasonably to believe something, one must have taken such measures as to not be reckless or negligent with respect to the truth of the matter. In other words, one must be seen as exercising due care with respect to the truth of the matter in issue.

40 M.J. 432, 437 n.5 (C.M.A. 1994). "If a mistake is honest yet 'patently unreasonable,' the defense is unavailable to an appellant." *United States v. Rodela*, 82 M.J. 521, 526 (A.F. Ct. Crim. App. 2021) (quoting *Davis*, 76 M.J. at 230).

## B. Analysis

Appellant alleges that his conviction for sexual assault without consent is legally and factually insufficient. Appellant has asserted an assignment of error and shown a specific deficiency in proof. We have weighed the evidence, determined controverted questions of fact, and given appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence. Viewing the evidence in totality, including through the lens provided in *Mendoza*, we find the evidence presented is factually insufficient to support the conviction for sexual assault as charged. We do not make a determination regarding Appellant's legal sufficiency claim.

Per *Mendoza*, the Government was required to prove that CL did not consent to sexual conduct with Appellant at a time when she was capable of consenting. Intrinsic to that theory and raised by Appellant at trial and on appeal is his contention that if in fact CL did not consent, he held an honest and reasonable mistake of fact as to consent. Appellant's testimony of what occurred after they returned to CL's hotel room leading up to and including the sexual act was more complete than the events relayed by CL. CL, by her own admission, could not recall anything after leaving the Waffle House before she awoke to Appellant penetrating her. CL believed this was the only time she awoke after falling asleep that evening and recalled no other sexual acts. However Appellant testified they had oral sex and intercourse, much of which was initiated by CL, before they fell asleep. He also recalled that when he awoke, he

was flaccid and not having intercourse with CL and that he reached out to touch her, causing her to recoil. It is unclear if CL was awake before he touched her. According to Appellant's testimony, he did not go back to sleep after this touch leading to CL's recoil.

The evidence leaves us with significant questions unanswered related to whether CL was capable of consenting at any point surrounding the sexual act(s) and whether she did not consent to sexual conduct with Appellant. CL testified that she drank multiple alcoholic drinks over the course of the evening, but she also stated that there was a time when she could not remember if she consumed alcohol or not at certain bars they visited after they left the concert and casino. Moreover, CL was clear that she could not recall many events throughout the evening and no events between the time when they left the Waffle House and the time when she awoke to Appellant penetrating her.

At trial, a forensic psychologist testified concerning "alcohol blackout" defining it as "a period of time where a person is conscious and functioning, but . . . they're not going to remember it later." Essentially, a person in an alcohol blackout is awake and can engage in "goal-directed behavior" such as "walking and talking." They could engage in consensual sexual behavior, but they would not be able to store the events in their long-term memory in order to recall the events later. This can happen either "en bloc" or "fragmentary," meaning a complete blackout or a blackout where "bits and pieces" manage to get transferred to long term memory and can be recalled later, respectively. He further explained that people often conflate alcohol "blacking out and passing out." When one is passed out, they are unconscious or asleep and cannot engage in goal-directed behaviors the way a person experiencing a blackout can. He also explained that one could be in a blackout state and not exhibit significant outward signs of intoxication, making it difficult for another to know that the individual with whom they are interacting is in fact in a blackout state. He gave no opinion specific to CL or Appellant. The testimony provided by CL and Appellant support the contention that CL was likely in varying stages of alcohol blackout during the evening and early morning hours surrounding the alleged sexual assault.

Activity captured on CCTV shows, and testimony by both CL and Appellant confirms, the two engaged in friendly interactions throughout the evening that could be characterized as flirtatious conduct. According to Appellant, they also hugged and kissed. At one point, CL jumped playfully into his arms and threw her legs around him. It is not inconceivable that this mutual flirtatious behavior continued when they were in CL's hotel room in the early morning hours after leaving the Waffle House as described by Appellant. Both Appellant and CL were drunk, making it conceivable that neither accurately remembered the exact events of the evening or exhibited the best judgment—especially in light

of evidence they were both in relationships, Appellant having been married and CL having had a boyfriend. Given the conflicting evidence about what occurred in CL's hotel room and her complete lack of memory during that time, in addition to the testimony from both CL and Appellant comprising the totality of the circumstances of the evening, we are not convinced beyond a reasonable doubt that CL was, at the time of the sexual act, capable of consenting but did not consent.

Assuming arguendo CL could consent before any sexual act(s) occurred, but did not consent, the Government did not disprove the affirmative defense of Appellant's reasonable mistake of fact as to consent. At trial and on appeal, Appellant raised the defense of reasonable mistake of fact as to consent. Appellant testified that while at the casino and concert, he and CL were "opening up a lot to each other and . . . leaning into each other." He further testified that "her hand . . . grazed [his] knee and at some point [he] put [his] arm on top of hers." CL confirmed that he did put his arm on top of hers and she "did not remove it." Appellant also testified that he put his "arm around her and she kind of nuzzled into [his] shoulder and [he] . . . kissed the top of her [ ]." CCTV from the casino shows them interacting in a friendly manner with him touching her shoulders and playing with her hair. CCTV further shows the two dancing together back-to-back and generally interacting in a close and flirtatious manner. According to Appellant, they had been "flirty all over each other all night, and then [they] were interacting on the way to the car, and then she excitedly just jumped up in [his] arms and kind of wrapped her legs around [him]." Additionally, they hugged and kissed that night before going back to CL's hotel room. CL invited Appellant to her room and then recommended he stay the night because they had been drinking.

According to Appellant, there was no indication that CL was overly intoxicated to the point of losing control of her faculties at any point during the evening and into the early morning hours leading up to the sexual act(s). According to him, CL walked, talked, and conducted herself normally throughout the night. She did not slur her words, was able to get in and out of the car on her own volition, and ordered her own food at the Waffle House. When they returned to her hotel, Appellant walked her to her room, she found the door key and opened the door without incident. After entering her room, CL went into the bathroom and changed her clothes. When she came out of the bathroom, she lay on her bed "looking over at [Appellant] and . . . kind of giggling playfully" wearing a shirt and shorts. Appellant recalled that CL then invited him to "rub [her] back" or "to cuddle." Upon this invitation, Appellant "crawl[ed] into bed with her" and started rubbing her back, they kissed and embraced on top of the covers and at some point they both moved under the covers. CL took off her own shorts and remained playful. CL's conduct made Appellant believe she wanted to have sex. CL instigated oral sex and seemed to be engaged in

and enjoying the sexual encounter. It was CL who helped Appellant undress and brought him a condom and instigated vaginal intercourse. Appellant believed CL was awake and consenting during all sexual encounters. Further, as soon as Appellant thought something might be amiss, he got out of the bed, he went to CL's side of the bed, knelt down, and asked her what was wrong. This is evidence that his mistake of fact as to her consent was honest. Given the facts as provided by Appellant, the person with the clearest account of events throughout the evening, we find the Government did not disprove Appellant's contention that he had an honest and reasonable mistake of fact as to consent by CL for the sexual act(s) between the two.

Crucial to our resolution of the issues at bar is the fact that Appellant was not charged with sexual assault upon a person who was asleep at the time the sexual act occurred. He was charged with sexual assault of CL without her consent. Our colleague in the dissenting opinion agrees this creates an issue for the Government's case. The Government relied entirely on CL's allegation that she woke up at the time Appellant was "thrusting his penis inside of [her]"—she was sleeping when he penetrated her—and "[a] sleeping or unconscious person cannot consent" as their theory of the case. Effectively, the Government charged one offense and factual theory and then argued a different offense and different factual theory at trial. Per *Mendoza*, this charging decision robbed Appellant of due process to know "what offense and under what legal theory he will be tried and convicted." *Mendoza*, 85 M.J. at 220 (citation omitted); *see also* U.S. CONST. amend V.

Our superior court in *Casillas* recently found that it is possible to determine consent, or lack thereof, during the timeframe after initial penetration on a sleeping person or a person incapable of consenting under the theory of "without consent." The court explained that if the sleeping person awakes and is at that point cognizant and thus capable, or if the incapable person suddenly becomes capable of consenting while the penetration is occurring, that moment of capability satisfies the requirements under Article 120(b)(2)(A), UCMJ. *Id.* at *11. In *Casillas*, the court found that the victim's testimony "establishe[d] that she was awake and aware of what was happening for at least a short time when Appellant was penetrating her." *Id.* at *14. They further found that "[d]uring that period, the evidence supports the rational conclusion that [the victim] had the capacity to consent, but that she did not consent to the sexual act." *Id.* In coming to this conclusion, the court necessarily relied on events that occurred earlier in the evening leading up to the initial sexual penetration upon the sleeping victim.

In *Casillas*, the victim and the appellant had never met before the evening in question; they were at a party with others and drinking to the point where the victim "felt super woozy and sick to her stomach;" the victim had not

invited the appellant to her home for the party as he was invited by another of her friends; others at the party had drank to the point of becoming sick and having to stay over, so the appellant and the victim were not alone at her home; the victim felt "as though she couldn't keep her eyes open;" when she lay down on her bed her female friend was also on the bed next to her and there was no indication that the victim invited the appellant to join her in her bed. *Id.* at *13–14. Further, when the victim awoke with the appellant penetrating her, she was aware of what was happening, and did not consent to the penetration. According to the specific facts of that case, our superior court found the conviction to be legally sufficient because a rational trier of fact could have found the essential elements of the Article 120(b)(2)(A) offense beyond a reasonable doubt as to the theory of without consent.

The case at bar is distinguished in its facts from *Casillas* such that considering the totality of the circumstances, Appellant would have had an honest and reasonable mistake of fact as to consent before he penetrated CL and ipso facto, during the penetration up until the point where CL, immediate to waking and realizing Appellant was penetrating her, "moved over further on the bed" towards the window to stop the penetration. According to Appellant's testimony, he believed everything was consensual, sexual acts had stopped, and there were no problems until he woke up—flaccid—touched CL's shoulder and she recoiled giving him some indication there might be something wrong. According to CL, the point when penetration had stopped due to her moving away from Appellant is the moment Appellant immediately got out of bed and went to her side of the bed and knelt down to inquire as to what was wrong. This indicates that the moment Appellant became aware CL did not want to engage in further intimacy, he did nothing to engage sexually with her. Both versions of events indicate that at the first indication something might be amiss, Appellant got out of bed and went to CL's side of the bed and knelt down to ask her what was wrong—indicating that his mistake of fact was honest and reasonable. If you believe Appellant, sex was not occurring at the moment CL awoke and indicated by recoiling that she did not want Appellant to touch her. If you believe CL, there was no point in the brief moment when she was awake and capable of consenting wherein Appellant would have known she in fact did not consent. The moment he realized she did not want to engage sexually with him, he respected her wishes not to engage in sexual act(s). Both scenarios result in the facts being insufficient to sustain the conviction.

Applying neither a presumption of innocence nor a presumption of guilt in making our own independent determination, we find that the evidence, as we weighed it, does not convince us of Appellant's guilt of the charged sexual assault offense against CL beyond a reasonable doubt. We are clearly convinced of this finding.

### III. CONCLUSION

The findings of guilty and the sentence are **SET ASIDE**. The Charge and its Specification are **DISMISSED WITH PREJUDICE**. All rights, privileges, and property, of which Appellant has been deprived by virtue of the findings and sentence set aside by this decision, are ordered restored. *See* Articles 58a(b), 58b(c), and 75(a), UCMJ, 10 U.S.C. §§ 858a(b), 858b(c), 875(a).

JOHNSON, Chief Judge (dissenting in part, concurring in the result in part):

I respectfully dissent in part. Unlike my esteemed colleagues, I would not grant Appellant relief on the grounds of factual insufficiency of the evidence. Instead, I would set aside the findings of guilty and the sentence due to trial counsel's prejudicial improper argument which, although understandable at the time, was plainly and obviously erroneous in light of our superior court's subsequent decision in *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024), and I would authorize a rehearing.

I explain my dissenting opinion in two stages: first, why I would not set aside the findings for factual insufficiency; and second, why I would set them aside for the improper findings argument.

### I. SUFFICIENCY OF THE EVIDENCE

#### A. Law

We review issues of legal sufficiency de novo. *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "Our assessment of legal sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Mendoza*, 85 M.J. at 227 (internal quotation marks and citation omitted).

We are neither required nor empowered to review the factual sufficiency of the evidence unless an appellant both (1) asserts an assignment of error and

(2) shows a specific deficiency in the proof. *United States v. Harvey*, 85 M.J. 127, 129 (C.A.A.F. 2024). The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.
>
> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>
> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B), *Manual for Courts-Martial, United States* (2024 ed.).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id*. at 131.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id*. at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id*. at 132. First, we must decide that evidence, as we weigh it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id*. Second, we "must be clearly convinced of the correctness of this decision." *Id*.

As the majority opinion explains, in order to convict Appellant of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920, as charged, the Government had to prove beyond a reasonable doubt: (1) that Appellant committed a sexual act upon CL by penetrating her vulva with his penis; and (2) that Appellant did so without CL's consent. *Manual for Courts-Martial, United*

*States* (2019 ed.), pt. IV, ¶ 60.b.(2)(d). "The term 'consent' means a freely given agreement to the conduct at issue by a competent person . . . . Lack of verbal or physical resistance does not constitute consent." 10 U.S.C. § 920(g)(7)(A). "A sleeping, unconscious, or incompetent person cannot consent." 10 U.S.C. § 920(g)(7)(B). "All the surrounding circumstances are to be considered in determining whether a person gave consent." 10 U.S.C. § 920(g)(7)(C). "Incapable of consenting" means "incapable of appraising the nature of the conduct at issue; or . . . physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue." 10 U.S.C. § 920(g)(8).

In *Mendoza*, the United States Court of Appeals for the Armed Forces (CAAF) held that Article 120(b)(2)(A), UCMJ, "criminalizes the performance of a sexual act upon a victim who is capable of consenting but does not consent," but does not apply where the victim is incapable of consenting. 85 M.J. at 220. Put another way, under *Mendoza*, an accused cannot be guilty of committing a sexual act in violation of Article 120(b)(2)(A), UCMJ, if the alleged victim was not capable of consenting at the time; cases in which the victim was asleep, unconscious, or incapable of consenting are prosecutable under other provisions of Article 120, UCMJ. *See id.*; *see also* 10 U.S.C. § 920(b)(2)(B)–(C).

## B. Analysis

CL testified she recalled "waking up to [Appellant] thrusting his penis inside of [her]" from behind as she lay on her side on the bed in her hotel room. CL testified "in that moment" she felt "scared, confused, [and] violated," and "just felt like [she] didn't know what to do." CL testified she then moved her body away from Appellant, which ended the penetration.[3]

I agree with the majority that, in light of *Mendoza*, we cannot sustain Appellant's conviction for penetrating CL's vulva with his penis without her consent, in violation of Article 120(b)(2)(A), UCMJ, while she was asleep, because at that point she was not capable of consenting. However, two other factors cause me to depart from the majority opinion.

First, based on CL's testimony, there was also a point in time where Appellant was penetrating CL's vulva with his penis without her consent while she was capable of consenting—specifically, after she awoke. At that point, she was

---

[3] The majority opinion gives considerable attention to Appellant's testimony, but relatively little attention to Appellant's admissions in his text messages to CL after the charged offense, during which Appellant admitted he might have penetrated her while she was asleep. Specifically, CL asked, "So, you're not disagreeing that I was asleep when you had sex with me?" Appellant responded, "The second time that may be what happened. I wasn't fully aware if you were or not, but if you were then, yes." Appellant later admitted, "The last part, yes, I f[**]ked up. I completely made a terrible judgment and did the wrong thing. It was all wrong."

aware the sexual act was occurring, and it made her feel "scared, confused, [and] violated." Moreover, she demonstrated her non-consent by moving away from Appellant in order to end the penetration. That CL was capable of demonstrating her non-consent by her actions implies she was also capable of consenting. Importantly, sexual assault in violation of Article 120(b)(2)(A), UCMJ, does not require the offending sexual act to last any particular period of time. In my view, a moment is sufficient, provided the essential elements of the offense are present, including the sexual act, absence of consent, and (after *Mendoza*) the victim's capacity to consent. CL's testimony indicates there was such a moment in time.[4]

That CL's testimony establishes a prima facie case for Appellant's guilt even in light of *Mendoza* does not necessarily mean the conviction is factually sufficient.[5] For example, Appellant might challenge the reliability of CL's testimony, or he might point to evidence that indicates he had a reasonable mistake of fact that she did consent. Such evidence could potentially "clearly convince" the CCA that the finding of guilty was "against the weight of the evidence," that is, not supported by proof beyond a reasonable doubt. *See Harvey*, 85 M.J. at 131.

However, this brings me to the second factor that dissuades me from finding Appellant's conviction factually insufficient. Under the applicable standard set forth in the current version of Article 66(d)(1)(B), UCMJ, the precondition for a CCA to review factual sufficiency of a conviction is that the appellant "makes a *specific showing* of a deficiency of proof." (Emphasis added). Only after the appellant makes such a showing may the CCA proceed with the factual sufficiency review. In my view, given the requirement that the appellant

---

[4] This fact pattern is similar to that in the CAAF's recent decision in *United States v. Casillas*, __ M.J. __, No. 24-0089, 2025 CAAF LEXIS 692 (C.A.A.F. 20 Aug. 2025). There, as in this case, the testimony indicated the initial penetration occurred when the victim was asleep. *Id.*, at *4. As in this case, the victim awoke during the penetration. *Id.* The CAAF held that because the victim "was awake and aware of what was happening for at least a short time when [the a]ppellant was penetrating her . . . the evidence supports the rational conclusion that [the victim] had the capacity to consent, but that she did not consent to the sexual act," and therefore the conviction under Article 120(b)(2)(A), UCMJ, was legally sufficient. *Id.* at *14.

[5] I find the evidence meets the "very low threshold" for legal sufficiency, which I do not further address here. *King*, 78 M.J. at 221.

identify a "specific deficiency" for review, it is that asserted deficiency the CCA reviews with respect to the factual sufficiency of the conviction.[6]

In this case, Appellant asserts his conviction is factually (as well as legally) insufficient specifically on the grounds that "the evidence failed to establish that the alleged victim was capable of consenting during the sexual act." Appellant relies in part to CL's testimony that she was initially asleep, and therefore incapable of consenting. In addition, Appellant points to CL's testimony that she felt "groggy and sleepy" after she awoke. However, one may be groggy and sleepy, yet capable of consenting to a sexual act. In light of CL's testimony that when she awoke she was aware of what was occurring, was not consenting to it, and demonstrated her non-consent by moving away from Appellant, I am not clearly convinced the conviction was against the weight of the evidence on that basis.

Appellant did not make a "specific showing" the findings were factually insufficient either because CL's testimony was not credible, or because Appellant had a reasonable mistake of fact that CL was consenting, or any other specific basis. Consequently, according to my understanding of Article 120(b)(2)(A), UCMJ, I do not believe I am empowered to review the factual sufficiency of the evidence on such alternative bases.

## II. IMPROPER ARGUMENT

### A. Additional Background

At the conclusion of the Government's opening statement, trial counsel stated:

> At the end of this trial the United States will stand up in closing argument and tell you that the accused made a terrible judgement [sic], that he did the wrong thing when he wasn't fully aware, and when he stuck his penis inside [CL's] sleeping body,

---

[6] I recognize another panel of this court evidently reached a different conclusion in its unpublished opinion in *United States v. Hunt*, No. ACM 40563, 2025 CCA LEXIS 215, at *19–20 (A.F. Ct. Crim. App. 16 May 2025) (unpub. op.). There, in the context of a withdrawn consent situation, the appellant raised factual insufficiency on appeal on the basis that "the Government failed to disprove the real possibility that the charged sexual act ceased promptly upon MM's withdrawal of consent." *Id.* at *19. However, the court found the conviction factually insufficient on a basis the appellant evidently had not asserted on appeal—that the Government failed to disprove "Appellant held both an honest and reasonable mistake of fact as to [the alleged victim's] consent during the charged sexual act." *Id.* at *20. To the extent *Hunt* stands for the proposition that a CCA may set aside a conviction as factually insufficient on a specific basis not asserted by the appellant, I respectfully disagree with my esteemed colleagues.

and we will ask that you find the accused guilty of sexual assault.

During the Government's closing argument on findings, trial counsel repeatedly asserted CL was asleep when Appellant penetrated her with his penis. He reiterated the military judge's instruction that a "sleeping or unconscious person cannot consent." He argued that, regardless of whether two individuals previously engaged in consensual sex, "if you wake up and you begin penetrating their vagina, sexually violating them in any way while they sleep, that is sexual assault." He continued, "[C]onsider why there is no consent. I mean. First there is no consent because she was asleep." Trial counsel emphasized Appellant's text message admission that CL might have been asleep when he penetrated her the "second time."[7] At the end of his argument, trial counsel asserted,

> [Appellant] wanted to have sex with this sleeping person. So, he rammed his d[*]ck into her vagina and thrust in her until she woke up. And those are circumstances that bring us here today.

> So, members, based on all the evidence in front of you, the fact that we know that the sexual act occurred the way [CL] described, the fact that we know that it was without her consent because it cannot have been with her consent, and because there is no way that [Appellant's] mistake in these circumstances was in any way reasonable, you should find [Appellant] guilty of sexual assault.

Trial counsel's rebuttal argument again referred to CL having been asleep, referring to Appellant's text admissions:

> [I]t's far more telling that when [CL] suggested to [Appellant] the exact circumstances in which something like, in colloquial terms, a rape would occur where she is asleep and he's penetrating her while she's asleep, motionless, not talking to him, [Appellant] adopts the statements in these text messages over and over.

Trial defense counsel did not object to any of these arguments.

**B. Law**

In general, we review improper trial counsel argument de novo. *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citation omitted). When no objection is made at trial, we review for plain error. *United States v. Andrews*,

---

[7] *See supra* note 1.

77 M.J. 393, 398 (C.A.A.F. 2018) (footnote and citation omitted). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id.* at 401 (quoting *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005)). In undertaking a plain error analysis, we "consider whether the error is obvious at the time of appeal, not whether it was obvious at the time of the court-martial." *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008).

"A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). In general, appellate courts "weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184). Reversal is warranted if "there was 'a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Voorhees*, 79 M.J. at 9 (quoting *United States v. Lopez*, 76 M.J. 151, 154 (C.A.A.F. 2017)).

## C. Analysis

In light of *Mendoza*, I find trial counsel's findings argument contained plain and obvious errors that materially prejudiced Appellant. The most obvious error was trial counsel's declaration that "if you wake up and you begin penetrating [the victim's] vagina, sexually violating them in any way while they sleep, that is sexual assault." Given that Appellant was charged with committing a sexual act without CL's consent under Article 120(b)(2)(A), UCMJ, trial counsel's declaration that Appellant was guilty as charged as soon as he penetrated the sleeping CL's vagina with his penis was plainly contrary to *Mendoza*. In addition, trial counsel's argument put repeated emphasis on the evidence that CL was asleep, and reiterated the military judge's instruction that a sleeping person cannot consent.

It is true that trial counsel also argued Appellant would be guilty of sexual assault even if CL had been awake when he penetrated her, because CL—lying still and quiet, facing away from him on the bed—had not consented to the sexual act whether she was asleep or awake. However, viewing trial counsel's argument as a whole, he plainly invited the court members to convict Appellant on the erroneous theory that CL was asleep and Appellant was guilty as soon as he penetrated her vulva with his penis while she slept. This was his first and primary argument.

It is also true that "[a]ll the surrounding circumstances are to be considered in determining whether a person gave consent," 10 U.S.C. § 920(g)(7)(C), and evidence that CL was asleep prior to the penetration may be relevant for the

court members to consider in deciding whether she consented. *Cf. Mendoza*, 85 M.J. at 222 ("Nothing in the article bars the Government from offering evidence of an alleged victim's intoxication to prove the absence of consent."). However, the critical distinction under *Mendoza* is that the accused's liability under Article 120(b)(2)(A), UCMJ, cannot be based on a period of time when the victim was incapable of consenting. In the instant case, trial counsel in no way focused his argument on the permissible theory under *Mendoza*, as described above, that Appellant was guilty based on the period of time after she awoke and became capable of consenting.

Turning to prejudice, under the circumstances of this case I find the *Fletcher* factors weigh in favor of finding Appellant was unfairly prejudiced by trial counsel's argument. First, I find the severity of the "misconduct"—that is, the error—to be very high in light of *Mendoza*.[8] Trial counsel directly argued the court members should convict Appellant because CL was asleep when he committed the sexual act, which was therefore without her consent, a theory of liability the CAAF has expressly rejected due in significant part to constitutional due process concerns.[9] *See Mendoza*, 85 M.J. at 220.

Second, no measures were adopted to cure the misconduct. There was no objection, nor any corrective instruction by the military judge. This is hardly surprising because *Mendoza* was yet to be decided, and trial counsel's argument reflected a then-commonly held understanding of Article 120(b)(2)(A), UCMJ. *See, e.g.*, *United States v. Harris*, No. ACM 39640, 2020 CCA LEXIS 299, at *26–27 (A.F. Ct. Crim. App. 2 Sep. 2020) (unpub. op.) ("Appellant entirely fails to explain why proof that [the victim] *could not* consent due to impairment by alcohol would not be relevant to prove that [the victim] *did not* consent, and thereby satisfy the elements of sexual assault by causing bodily harm, with which he was charged and for which he was convicted."), *rev. denied*, 81 M.J. 413 (C.A.A.F. 2021). Moreover, the military judge's standard

---

[8] Of course, this analysis is not intended as any indictment of trial counsel's professionalism, nor of trial defense counsel for failing to object, nor of the military judge for failing to intervene or provide corrective instructions. Trial counsel's argument reflected a common understanding of the state of the law at the time.

[9] Another panel of this court analyzed a similar issue of improper trial counsel argument in light of *Mendoza*, assuming plain error but finding no prejudice under the circumstances of that case. *United States v. Boren*, No. ACM 40296 (f rev), 2025 CCA LEXIS 103, at *20–31 (A.F. Ct. Crim. App. 19 Mar. 2025) (unpub. op.). In *Boren*, the court assumed without deciding the error was of constitutional dimensions, and applied the harmless beyond a reasonable doubt standard to its prejudice analysis. *Id.* at *27–31. Because I would find prejudicial error under either the constitutional or non-constitutional prejudice standards, for purposes of this opinion I do not definitively address whether the heightened standard is applicable.

instructions would have done little or nothing to redress trial counsel's error. Notably, trial counsel cited the military judge's instruction that a "sleeping or unconscious person cannot consent" in support of his erroneous argument that the sexual act was without consent because CL was asleep. Indeed, without *Mendoza's* explanation of how the various subsections of Article 120(b), UCMJ, relate to one another, trial counsel's erroneous argument appeared entirely congruent with the military's judge's instructions and offered the most obvious basis on which to conclude Appellant was guilty.

Finally, the weight of the evidence supporting Appellant's conviction on what I believe is, under *Mendoza*, the factually sufficient theory of liability—focused on the point in time after CL awoke—is not overwhelming. Without recapitulating every vulnerability in the Government's case, such factors as CL's poor memory of much of the night in question, evidence of her intoxication, evidence giving rise to the military judge's mistake of fact as to consent instruction, and Appellant's testimony providing a competing and exculpatory version of events, weigh against a conclusion that Appellant inevitably would have been convicted without the improper argument. Accordingly, I find a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Voorhees*, 79 M.J. at 9 (citation omitted).

For the foregoing reasons, I would set aside the findings of guilty and the sentence, and authorize a rehearing.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court